STATE OF IOWA for Use and Benefit of EMMET COUNTY, Appellee,
v. NATIONAL SURETY COMPANY OF NEW YORK et al.,
Appellants.

No. 40187.

APRIL 14, 1930.

*N. J. Lee,* for Enoch H. Hanson, appellant.

*Price & Burnquist,* for National Surety Company of New York, appellant.

*J. W. Morse, O. N. Refsell,* and *William S. Johnston,* for plaintiff, appellee.

WAGNER, J.—This action was originally instituted against the National Surety Company, the surety on the bond of Hanson, as county treasurer of Emmet County, to recover a shortage in the accounting of the county treasurer in the sum of $21,724.60, with interest and costs. The defendant Surety Company answered the petition, and filed a cross-petition against the county treasurer, who appeared and joined the Surety Company in the answer to the petition. By agreement of the parties, the action was transferred to the equity calendar, and tried as an action in equity. The trial court rendered judgment against the Surety Company for the amount of the shortage of the county treasurer, with interest and costs, and rendered judgment in favor of the Surety Company against the county treasurer for the same amount, and provided by the decree that any dividends to be paid by the receiver of the bank upon the claim of the county treasurer, in said receivership, should be paid to that defendant who makes payment of the judgment rendered. From the judgment and decree, both the county treasurer and the Surety Company appeal. Hanson makes no complaint of the judgment against him in favor of the Surety Company, in the event that plaintiff is entitled to the judgment rendered.

Hanson became county treasurer of Emmet County on the 2d day of January, 1925. The approved bond executed by the principal and surety is conditioned as follows:

"The condition of the above obligation is such, that the above bounden Enoch Hanson, having been duly elected county treasurer of said county at the November 1924 election for the term of two years from the 2d day of January, 1925, that as county treasurer in Emmet County, Iowa, he will render a true account of his office and of his doings therein to the proper authority, when required thereby, or by law; that he will promptly pay over to the officer or person entitled thereto all moneys which may come into his hands by virtue of his office; that he will promptly account for all balances of money remaining in his hands at the termination of his office; that he will exercise all reasonable diligence and care in the preservation and lawful disposal of all money, books, papers, securities, or other property appertaining to his said office, and deliver them to his successor or to any other person authorized to receive the same; and that he will faithfully and impartially, without fear, favor, fraud or oppression, discharge all the duties now or hereafter required of his office by law, and the sureties on such bond shall be liable for all money or public property that may come into the hands of such officer at any time during his possession of such office, then this bond to be void, otherwise in full force."

The amount of money representing the shortage of the county treasurer was on deposit with the Iowa Savings Bank of Estherville, which, on November 24, 1925, closed its doors, and was taken charge of by the superintendent of banking, as receiver. At that time, there was on deposit in said bank a fund belonging to the county in the sum of $71,724.60, but $50,000 of said amount has been established against the state sinking fund. See *Andrew v. Iowa Sav. Bank of Estherville*, 203 Iowa 1089. In the cited case, it was sought to establish the entire amount that was on deposit at the time of the closing of the bank against the state sinking fund, but this court held that the sinking fund was liable for only $50,000 of said deposit. This action is to recover on the fidelity bond of the treasurer the remainder of the deposit.

On May 4, 1925, the board of supervisors of the county adopted a resolution, entered of record, designating the Iowa Savings Bank as a depository for moneys coming into the hands of the county treasurer, and fixing the maximum amount to be

deposited in said bank at the sum of $84,000. On October 7, 1925, the board of supervisors repealed the aforesaid resolution of May 4th, and adopted a substitute resolution, entered of record, again designating said bank as a depository of public funds of the county, but provided that the maximum deposit of public funds in said bank should not exceed the sum of $50,000. At that time, the amount of the deposit in said bank was approximately the sum of $81,500. After the adoption of the substitute resolution, the treasurer did not make any deposits in said bank, and from that time until the closing of the bank, the deposit was reduced in the sum of $9,260.61, which amount being considered, together with the $50,000 received from the state sinking fund, and certain other small warrants, leaves the conceded amount of the shortage $21,724.60.

The appellants contend that they are not liable for the aforesaid amount, for the reason that the deposits were made in conformity with the resolution of May 4, 1925, and that, after the maximum amount to be deposited in said bank was reduced by the substitute resolution of October 7, 1925, the county treasurer exercised due diligence in an endeavor to comply with the substitute resolution.

Section 7412 of the Code, 1927, provides:

"The state treasurer and each county treasurer shall at all times keep all funds coming into their possession as public money, in a vault or safe, to be provided for that purpose, or in some bank legally designated as a depository for such funds."

Section 7404 of the Code provides:

"The county treasurer shall, with the approval of the board of supervisors as to place of deposit, by resolution entered of record, deposit state, county, or other funds in any bank or banks in the county or an adjoining county within the state of Iowa to an amount fixed by such resolution * * *."

Section 1090-a20 of the Code provides:

"No treasurer shall be liable for loss of public funds by reason of insolvency of the depository bank, when deposited hereafter as provided by law."

It will be observed from the aforesaid provisions of the

statutory law that it is mandatory for the county treasurer to keep the funds in a vault, or in some bank legally designated as a depository; that it is left to the board of supervisors to determine the banks in which the deposits are to be made, and the amounts thereof; and that, if the deposit is made by the treasurer in accordance with the provisions of the law, the treasurer is not liable for the loss of any funds so deposited, by reason of the insolvency of the depository bank. Upon the adoption of the repealing and substitute resolution of October 7, 1925, it became the duty of the county treasurer, if he could do so, to withdraw from the aforesaid bank all sums in excess of $50,000; for the bank was then an authorized depository of the county funds only to the amount of $50,000. See *Andrew v. Iowa Sav. Bank of Estherville,* 203 Iowa 1089. It is true that the requirement by the board of supervisors, in the adoption of a substitute resolution, that the county treasurer perform an impossibility would not make illegal the deposits previously and legally made under a former resolution. See *Andrew v. Iowa Sav. Bank of Estherville,* 206 Iowa 464. It is also true that equity does not require the doing of useless things, and that the fact that a check or checks were not drawn in favor of other depository banks against the aforesaid bank for the amount of the excess of the deposit in said bank is immaterial, provided that the record establishes the fact that said checks would not, and could not, have been paid. See *Andrew v. Iowa Sav. Bank of Estherville,* 206 Iowa 464. In *Andrew v. Iowa Sav. Bank of Estherville,* 203 Iowa 1089, we declared:

"Following the order of the board of supervisors fixing the limit of the deposit of county funds in the bank at $50,000, the treasurer was entitled to a reasonable time, consistent with the ordinary course of business, to withdraw the amount of funds in excess of the limit fixed by the board."

By this is meant that he was not required to take an extraordinary course to make the withdrawal, but was required to exercise all reasonable diligence and care in order to make the deposit in the bank conform to the resolution. It will be observed that one of the conditions of the bond is:

"That he [the treasurer] will exercise all reasonable dili-

gence and care in the preservation and lawful disposal of all money * * * or other property appertaining to his office.''

Another is:

''That he will faithfully and impartially, without fear, favor, fraud or oppression, discharge all the duties now or hereafter required of his office by law.''

The record reveals that, within a day or two after the adoption of the resolution, the treasurer was informed by the auditor of its adoption, and that he went to the auditor's office and looked at the resolution, and noticed that the limit of the deposit ·in the aforesaid bank was reduced to $50,000. He did not comply with the resolution. The question is: Was it possible to comply therewith, and did he exercise all reasonable diligence in an honest endeavor to reduce the amount of deposit to comply with the resolution? It will be observed that, at the time of the adoption of the repealing and substitute resolution, the amount of the deposit in the bank was below the amount provided for by the resolution of May 4th, but exceeded the maximum amount provided for in the substitute resolution of October 7th in the sum of approximately $31,000. No action relative to the payment of, or refusal to pay, this excess was taken by the board of directors of the bank, but Groves, the president of the bank and the owner of a controlling interest therein, and Stockdale, the cashier, discussed the matter, and came to the conclusion that they would not permit a withdrawal in a lump sum of the excess of the deposit, but that said excess should be withdrawn in the ''usual course of business.'' The amount of the cash reserve (cash in the bank and amounts on deposit with correspondent banks) on October 7th was, in round numbers, $37,000; on October 10th, $42,000; and thereafter, the amount of the cash reserve fluctuated, but generally declined, until the time of the closing of the bank, when there was a deficit of $23,000. On November 3d, the amount of the cash reserve was $30,000; between the dates of October 7th and November 3d, the amount of the cash reserve at all times exceeded the sum of $19,000, except on October 16th, when it had decreased to $12,000, but the next day increased to $24,000, and on October 24th, the amount of the cash reserve· was $35,000. It will thus be observed that there

were times when the bank could have paid the entire amount of the excess from the cash reserve. Very shortly after October 7th, Hanson talked with both the president and the cashier, and was informed that they would not pay checks for withdrawals, but that they would pay his checks in the "usual course of business." It thus becomes apparent that the officers of the bank, whether rightly or wrongly, had determined that they would not permit the withdrawal of the excess in one lump sum. Did Hanson exercise all reasonable diligence and care in an honest endeavor to reduce the deposit, before the bank closed, to $50,000? The county treasurer testified:

"I just discontinued to make any more deposits, and whenever there was a cash item from the bank, either local or foreign, would be presented at the treasurer's office, we would check on their bank for the payment of it. Any cash item coming from various banks we always checked on the bank that brought them in. Q. So the only way you sought to reduce your deposit in the Iowa Savings Bank was just in the way you had been doing business with them always before, of paying only the checks which were drawn on that bank? A. Yes, and not making any more deposits."

It will thus be observed that the treasurer did nothing to reduce the deposit, except to draw checks for cash items coming from said bank. He pursued no different course after the adoption of the resolution than had been pursued by him prior thereto, except that he did not make any deposits in the bank. Did his course of conduct constitute due diligence in reducing the deposit? Did he exercise all reasonable diligence and care in an effort to reduce the deposit to $50,000? Did he do what he could have done in this respect, even if he had acted in accordance with the suggestions of the officers of the bank? After the adoption of the repealing resolution, the treasurer drew checks upon his depository banks in the sum of $87,000, and only approximately $9,000 of it was checked out of the aforesaid bank. In each of five of the depository banks other than the Iowa Savings Bank, his checks during said period ran, in round numbers, from $11,000 to $17,000. Mr. Groves, the president of the bank, testified:

"He [Mr. Hanson] came to me, I think, about a week after this resolution. I told him in my judgment he should not deposit any more money there, but I said we would not pay any more checks for withdrawals, 'and I want you to understand that we will pay your checks in the usual course of business.' By 'usual course of business' are checks that were necessary to run the business of the community. And I further added this to him: that I wanted him to treat us absolutely fair; that we were willing to take a little more of the punishment than the other fellows. 'In the usual course of business,' we would have paid his checks. *I told the county treasurer that we were willing to take a little more punishment than the other fellows.*"

Hanson testified:

"I had a talk with him [Groves] substantially as he testified. Stockdale [the cashier] told me that we would have to take care of business in the general course of the county's business. Q. Now, then, those items that went to reduce the deposit in the First National Bank, part of them could have gone through the Iowa Savings Bank, couldn't they? A. I suppose. I don't know what items it might have been. They might have been school orders. Q. And you could have just as well drawn a check on the Iowa Savings Bank as the First National Bank, couldn't you? A. I could,—part of it could have been drawn. While I had in mind to do nothing to close the bank, in a former trial I testified it might embarrass the bank at times. I had that in mind. I had in mind to protect the funds of the bank."

It is also shown that, a short time before the bank closed, the county treasurer turned over to the city treasurer, at the Iowa Savings Bank, a deposit of $15,000, and to make up his deposit, drew two checks on other banks, when said checks could have been drawn upon the Iowa Savings Bank. Stockdale, the cashier, testified:

"Whether we would cash Hanson's checks depends upon the manner of presentation. If checks were presented in the usual course of business, or for county bills, we would pay them. If he had reduced that account at the rate of $5,000 or $6,000 at a clip, in the usual course of business, we would have paid the checks. When he sent checks to the state treasurer, remitting

state taxes and things of that kind, that was the usual course of business.''

On the day before the bank closed, the treasurer presented a check for the excess of the deposit. The cashier testified: ''There was a definite arrangement between Hanson, Mr. Groves, and myself that he would present this check.'' It is apparent that, at that time, the bank was about to close, which fact was known by the officers of the bank, and in all probability by the county treasurer. To more fully set out the testimony upon which the proposition of fact must be determined, would unduly extend the length of this opinion. Perhaps it is not amiss to say that the county treasurer had one share of stock in this bank. The bank remained open for more than six weeks after the adoption of the repealing and substitute resolution. Other deposits were paid, and, according to his testimony and that of the officers of the bank, his checks in the ''general course of business'' in payment of obligations due from the county would have been honored and paid. There were such obligations, which were paid by checks drawn upon other banks, in which the deposits were within the limit fixed by the resolution. It is apparent that, had they been drawn on the Iowa Savings Bank, they could and would have been paid, and the deposit in the bank reduced, to conform to the resolution.

The question of the wisdom of the adoption of the repealing resolution on October 7th is none of our concern. Under the statutory law, the board of supervisors is the governing body, to determine, by resolution, the depository and the amount to be deposited therein, and it is the duty of the treasurer to exercise all reasonable diligence and care in an effort to comply with the resolution.

We have read the record with care, and it is apparent therefrom that the county treasurer did not exercise due and reasonable diligence and care to reduce the amount of the deposit, and that because thereof the amount of the excess on deposit at the time of the closing of the bank has been lost to the county. We fully agree with the judgment of the trial court, and the same is hereby affirmed.—*Affirmed.*

Morling, C. J., and Stevens, De Graff, and Albert, JJ., concur.